UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

KLEIBER ALEXANDER
ARIAS GUDINO,

              Petitioner

    v.

CRAIG LOWE, et al.,

              Respondents.

CIVIL ACTION NO. 1:25-CV-00571

(MEHALCHICK, J.)

**MEMORANDUM**

Petitioner Kleiber Alexander Arias Gudino ("Gudino") brings this petition for a writ of habeas corpus against Respondents Pamela Bondi ("Bondi"), Craig Lowe ("Lowe"), Brian McShane ("McShane"), Todd. M. Lyons ("Lyons"), and Kristi Noem ("Noem") (collectively, "Respondents"), requesting the Court order his release from custody and enjoin Respondents from re-detaining him pending immigration proceedings.[1] (Doc. 1). Immigration authorities detained Gudino on March 14, 2025, first for an alleged violation of

---

[1] Respondents aver that Lowe is the only proper respondent to this action and all other Respondents should be dismissed. (Doc. 32, at 1). "The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (quoting 28 U.S.C. § 2242); 28 U.S.C. § 2243 ("[t]he writ, or order to show cause shall be directed to the person having custody of the person detained"); *see Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 444 (3d Cir. 2021) ("if a § 2241 petitioner does not adhere to the immediate custodian rule, then the district court lacks jurisdiction to entertain the petition"). As such, Lowe is the proper Respondent. (Doc. 1, ¶ 2); *see Rumsfeld*, 542 U.S. at 434. The other Respondents are **DISMISSED**. However, the government will be bound by the Court's judgment because Lowe is acting as an agent of the federal government by detaining Gudino on behalf of Immigration and Customs Enforcement. *See Madera v. Decker*, 18 Civ. 7314, 2018 WL 10602037, at *9-*10 (S.D.N.Y. Sep. 28, 2018) (finding the warden acts as an agent of the ICE regional director when ICE makes initial custody determinations including setting of a bond and review of conditions of release); *see also Quispe v. Rose*, No. 3:25-CV-02276, 2025 WL 3537279, at *1 n.1 (M.D. Pa. Dec. 10, 2025).

an order of supervision and then because the Department of Homeland Security ("DHS") withdrew his temporary protected status ("TPS"). (Doc. 18-4; Doc. 22-1). The Court granted a preliminary injunction and ordered Gudino's release on April 21, 2025. (Doc. 29). The Court now assesses Gudino's petition for a writ of habeas corpus on the merits. (Doc. 1). For the reasons discussed below, Gudino's petition is considered granted.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The facts relevant to Gudino's petition are identical to those the Court discussed while addressing Gudino's motion for a preliminary injunction. (Doc. 28, at 4-7). Gudino is a Venezuelan national whom DHS granted TPS on January 20, 2025. (Doc. 1-1). Prior to his grant of TPS, the United States Immigration and Customs Enforcement ("ICE") detained Gudino while he was litigating an asylum claim and awaiting a final removal order. (Doc. 13, at 12). After a 90-day "removal period" during which he was subject to mandatory detention, "ICE released [Gudino] pursuant to regulations that require the release of a noncitizen with a final removal order where 'there is no significant likelihood that the [noncitizen] will be removed in the reasonably foreseeable future.'" (Doc. 13, at 12) (quoting 8 C.F.R. § 241.4(i)(7)). ICE subsequently issued an order of supervision providing the conditions of Gudino's release, placed him on ICE's Intensive Supervision Appearance Program ("ISAP"), and required him to wear an ankle monitor. (Doc. 13, at 13). The order of supervision contains several conditions, including "not to associate with [known] [sic] gang members, criminal associates, or be associated with any such activity." (Doc. 17, at 15; Doc. 18-11, at 3). The order of supervision also directs Gudino not to commit any crimes and states that a violation of the order's conditions may result in Gudino being taken into custody. (Doc.

17, at 15; Doc. 18-11, at 3). DHS removed Gudino's ankle monitor after it granted him TPS. (Doc. 13, at 13).

On March 14, 2025, a Federal Bureau of Investigations ("FBI") Task Force effectuated a search warrant at an apartment located at 1463 St. Lawrence Avenue in the Bronx, New York. (Doc. 17, at 16; Doc. 18-12; Doc. 18-13). Lowe alleges that the search was connected to gang-related investigations associated with Tren de Aragua ("TdA"), a criminal organization with origins in Venezuela. (Doc. 17, at 16-17; Doc. 18-12; Doc. 18-13, at 2). Gudino was present at 1463 St. Lawrence Avenue at the time the FBI conducted the search, as he, his mother, and his one-and-a-half-year-old infant child were living in a rented room at that same address. (Doc. 17, at 16; Doc. 18-13, at 2; Doc. 19-1; Doc. 19-2). According to sworn declarations by Gudino and his mother, 1463 St. Lawrence Avenue "contained several rooms that were rented out individually on a weekly basis to different people." (Doc. 19, at 8; Doc. 19-1, ¶ 6; Doc. 19-2, ¶ 5). He and his family rented two rooms and Gudino claims he did not know the people who rented the other rooms. (Doc. 19, at 8; Doc. 19-1, ¶ 6; Doc. 19-2, ¶ 5). The sworn declarations also provide that neither Gudino nor his mother were aware that any inhabitants of 1463 St. Lawrence Avenue were involved with gang activity, nor were they aware that any renters were associated with gang members. (Doc. 19, at 8; Doc. 19-1, ¶ 6; Doc. 19-2, ¶ 5). The FBI contacted ICE and notified the agency of Gudino's presence, and ICE arrested and detained him. (Doc. 17, at 17; Doc. 18-13). Gudino suggests that he has been identified as being associated with TdA solely because he was present at 1463 St. Lawrence Avenue at the time of the search. (Doc. 19, at 8-9). Lowe submits that Gudino was detained as he was "identified as a member of [TdA] by the FBI." (Doc. 18-13, at 4).

Following his arrest by ICE on March 14, 2025, Gudino's attorney contacted ICE to inquire as to the basis for his detention, and she was told that he was "statutorily ineligible for temporary protected status" under "relevant statutory and regulatory provisions." (Doc. 1, ¶¶ 64-66). Gudino also inquired about his detention and received confirmation that he did have TPS. (Doc. 1, ¶ 67).

On March 31, 2025, Gudino filed the instant habeas petition, seeking relief pursuant to 28 U.S.C. § 2241. (Doc. 1). On April 7, 2025, Gudino filed a motion for a temporary restraining order and preliminary injunction, along with a brief in support, seeking immediate release from ICE detention. (Doc. 10; Doc. 13). The Court held a hearing on Gudino's motion on April 15, 2025, and on April 14, 2025, on the eve of the hearing, Gudino received notice that his TPS had been withdrawn. (Doc. 22-1). The Court granted Gudino's motion for a preliminary injunction on April 21, 2025. (Doc. 29). On May 7, 2025, Lowe filed a response to Gudino's petition. (Doc. 32). On July 3, 2025, Gudino filed a traverse in support of his petition. (Doc. 39).

## II.    LEGAL STANDARDS

28 U.S.C.A. § 2241 governs district courts' power to grant the writ of habeas corpus. Under 28 U.S.C.A. § 2241(b), the writ of habeas corpus extends to petitioners "in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States." Claims where non-citizens challenge immigration enforcement-related detention "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022)). "For 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement.'" *J. G. G.*, 604 U.S. at 672. While habeas relief

typically involves release from custody, courts may order alternative relief such as prohibitions on removal in immigration related habeas cases. *See J. G. G.*, 604 U.S. at 673 (finding that a noncitizen detained by ICE may challenge removal in a habeas petition). While reviewing a noncitizen's habeas petition, courts evaluate whether the government complied with regulatory, statutory, and constitutional protections for noncitizens. *See Martinez v. McAleenan*, 385 F. Supp. 3d 349 (S.D.N.Y. 2019) (finding ICE failed to comply with regulatory and constitutional notice requirements prior to detaining a non-citizen petitioner and granting the petitioner's habeas petition). If the Court determines that the government unlawfully detained a petitioner, the Court may order "his immediate release from custody." *Martinez*, 385 F. Supp. 3d at 372.

## III.    DISCUSSION

Gudino brings his habeas petition pursuant to 28 U.S.C. § 2241, and alleges that the government violated the Constitution and laws of the United States when it detained him on March 14, 2025. (Doc. 1, ¶ 58). Gudino's petition is soundly before the Court, as requests for wrongful detention in immigration contexts are properly brought in habeas and the Court has jurisdiction over immigration-related habeas petitions.[2] *See J. G. G.*, 604 U.S. at 672 (acknowledging that immigration-related detainees' claims "fall within the 'core' of the writ of habeas corpus") (quoting *Nance*, 597 U.S. at 167). Gudino requests habeas relief declaring his prior detention unlawful and preventing future detention. (Doc. 39, at 21). According to Gudino, he is entitled to habeas relief because statutory and regulatory protections for TPS recipients prohibit Respondents from detaining him. (Doc. 1, ¶¶ 93-97). Gudino further

---

[2] 8 U.S.C. § 1252 includes a jurisdictional bar prohibiting federal courts from reviewing orders of removal. 8 U.S.C. § 1252. The Court is not reviewing an order of removal, and as such, 8 U.S.C. § 1252 is no bar to this Court's jurisdiction.

contends that Respondents violated his Fifth Amendment due process rights when they detained him without advanced notice or the opportunity to challenge his detention.[3] (Doc. 1, ¶¶ 103-115). The Court will first analyze Gudino's statutory and regulatory arguments and then turn to his Fifth Amendment arguments.

A.    STATUTORY AND REGULATORY PROTECTIONS

Gudino's petition is based, in part, on statutory and regulatory protections for TPS recipients.[4] (Doc. 1, ¶¶ 93-97). According to Gudino, TPS recipients may not be detained

---

[3] Gudino also avers he is entitled to relief under the Administrative Procedure Act ("APA"). (Doc. 1, ¶¶ 98-102). The Court need not assess Gudino's APA claims because APA claims may only be addressed after a final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704; *see also Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 495 (6th Cir. 2014). Here, Gudino's APA claim is based on Respondents' withdrawing his TPS. (Doc. 1, ¶¶ 98-102). However, Gudino himself contends he is currently engaged in an administrative appeals process to challenge Respondents' withdrawal of his TPS and retains the protections of his TPS. (Doc. 39, at 15-16). Thus, even by Gudino's own account, the withdrawal of this TPS is not a final agency action and the Court may not consider his APA claims under 5 U.S.C. § 704.

[4] As the Court noted in its ruling on Gudino's motion for a preliminary injunction, the current state of TPS for Venezuelan asylum seekers is unclear. (Doc. 28, at 1-4). On January 28, 2025, DHS removed TPS protections for Venezuelan asylum seekers. *See* Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025). On September 5, 2025, the Northern District of California vacated DHS's decision to rescind TPS protections. *See Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108 (N.D. Cal. 2025). On January 28, 2026, the Ninth Circuit affirmed this decision. *Nat'l TPS All. v. Noem*, No. 25-5724, 2026 WL 226573 (9th Cir. Jan. 28, 2026). Prior to the Ninth Circuit's decision, however, the Supreme Court issued an order which stayed the Northern District of California's order vacating DHS's decision pending both the outcome of Ninth Circuit review and a timely petition for writ of certiorari before the Supreme Court. *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 222 L. Ed. 2d 1241 (2025). The government may file a petition for writ of certiorari up to ninety days after the Ninth Circuit's final order, and thus, the Supreme Court's stay on the Northern District of California's decision is still in place. *See* 28 U.S.C.A. § 2101(c) (dictating that an appellant has ninety days after an appellate court order to file a Supreme Court petition for writ of certiorari). However, the Court need not address this issue because, for the reasons discussed *infra* Section III.A.3 and *infra* Section III.B.2, the government violated Gudino's rights based on violations of regulations pertaining to orders of supervision and the Fifth Amendment, not TPS protections. The Court need not delay resolving this matter pending the outcome of the appellate litigation because that litigation would not change the outcome in this case. *See Hatcher v. SCM Grp. N. Am., Inc.*, 167 F. Supp. 3d 719, 730 (E.D. Pa. 2016)

based on their immigration status, and the government detained him based on his immigration status. (Doc. 1, ¶ 96-97). Lowe counters that Gudino does not have TPS, and even if he did, the government detained Gudino because he violated his order of supervision, not because of his immigration status. (Doc. 32, at 17-21). Lowe further avers that the government is permitted to detain Gudino based on the withdrawal of his TPS. (Doc. 32, at 19-21). The Court will begin its analysis by addressing the statutory and regulatory framework governing TPS and its protections. Next, the Court will assess whether the government was permitted to detain Gudino based on his alleged violation of his order of supervision. Finally, the Court will address Lowe's arguments that the government may detain Gudino based on DHS's withdrawal of Gudino's TPS.

1.       **Statutory and Regulatory Framework**

Whether the government may detain Gudino despite his TPS is dependent on the interplay between several related statutes and regulations. (Doc. 28, at 9-11). The relevant statutes and regulations are as follows:

- Immigration and Nationality Act ("INA") § 208(b)(2)(A), codified as 8 U.S.C. § 1158: codifies procedures for withdrawal of asylum and eligibility for asylum as part of the United States Code and regulatory scheme governing asylum

- 8 U.S.C. § 1254a – Temporary Protected Status

  o   8 U.S.C. § 1254a(a)(1)(A) – prohibiting removal of TPS holders

  o   8 U.S.C. § 1254a(d)(4) – prohibiting detention of individuals with TPS "on the basis of the alien's immigration status;" this provision is under the subsection related to documentation of TPS holders

---

(declining to "prolong this litigation pending the outcome of [appellate litigation] . . . because it would not affect the outcome of this case").

7

- 8 C.F.R. § 241.4 – governing detention of noncitizens beyond removal period

    - 8 C.F.R. § 241.4(l)(1) – stating that noncitizens may be taken into "custody" in certain circumstances, including violations of release conditions

- 8 C.F.R. § 244.4 – listing two categories of aliens ineligible for TPS, including individuals who have committed certain crimes and aliens described as ineligible for asylum in § 208(b)(2)(A) of the Immigration and Nationality Act ("INA")

- 8 C.F.R. § 244.14 – listing procedures for TPS withdrawal and vests authority to withdraw TPS in USCIS

- 8 C.F.R. § 244.10 – describing procedures for individuals appealing TPS designation decisions and defines temporary benefits for individuals during their appeal process

Analysis of the statutory and regulatory framework outlined above is governed by basic principles of statutory interpretation, as contemplated by the Third Circuit Court of Appeals:

> As with all questions of statutory interpretation, we first turn to the statutory language "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Marshak v. Treadwell*, 240 F.3d 184, 192 (3d Cir. 2001) (citations and internal quotation marks omitted). We discern "[t]he plainness or ambiguity of statutory language ... by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. (citations and internal quotation marks omitted). Where "the statutory meaning is clear, our inquiry is at an end." *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 222 (3d Cir. 2004); *Marshak*, 240 F.3d at 192.
>
> *Gordon v. Wawa, Inc.*, 388 F.3d 78, 81 (3d Cir. 2004).

Further, when evaluating regulations enacted by federal agencies pursuant to statutes, courts must "independently interpret statutory text." *Miller Plastic Prods. Inc v. Nat'l Lab. Rels. Bd.*, 141 F.4th 492, 503 (3d Cir. 2025). However, courts give effect to regulations that are unambiguously consistent with statutory text and have shaped judicial precedent. *Miller Plastic*

*Prods. Inc*, 141 F.4th at 503 (considering a regulation which interpreted statutory language because the regulation was consistent with the statute).

### 2.    Overview of TPS Protections

"[A] TPS recipient is 'considered as being in, and maintaining, lawful status as a nonimmigrant' for the purpose of becoming [a legal permanent resident]." *Sanchez v. Mayorkas,* 593 U.S. 409, 412 (2021) (quoting 8 U.S.C. § 1254a(f)(4)). Relevant authorities "shall not remove the [noncitizen] from the United States during the period in which [TPS] is in effect." 8 U.S.C. § 1254a(a)(1)(A). Likewise, 8 U.S.C. § 1254a(d)(4), as part of the subsection related to documentation of TPS, provides that a non-citizen with TPS "shall not be detained by the Attorney General on the basis of the [noncitizen]'s immigration status in the United States."

Under federal regulations, TPS recipients generally retain the benefits of TPS after DHS withdraws their TPS pending the TPS recipient's appeal of the withdrawal. 8 C.F.R. § 244.10(e)(2); *see Claros-Ramirez v. Atty. Gen. of U.S.*, 183 Fed. Appx. 271, 273 n.2 (3d Cir. 2006) (nonprecedential) (finding even if a TPS application is denied, a noncitizen has right to appeal the decision, during which time he retains the benefits of TPS including non-removal); *see also Salad v. Dep't of Corr.*, 769 F. Supp. 3d 913, 923 (D. Alaska 2025) (finding the same); *see also Puentes v. Garite*, 780 F. Supp. 3d 682, 697-98 (W.D. Tex. 2025) (finding former TPS recipients retain TPS benefits pending an appeal of DHS withdrawing their TPS). However, TPS statutes and regulations only list non-detention on the basis of immigration status as a benefit of TPS and do not list a general protection against non-detention as a benefit of TPS. *See* 8 U.S.C. § 1254a(d)(4); *see also* 8 C.F.R. § 244.10(f).

9

### 3. Detention based on Gudino's alleged violation of his order of supervision

The Court previously determined that Gudino was unlikely to succeed on the merits of his claim that his TPS protects him from detention on the basis of his alleged violation of his order of supervision. (Doc. 28, at 12-13). Respondents urge the Court to make a final determination on the merits on this issue and find that Gudino may be detained for allegedly violating his order of supervision regardless of his TPS. (Doc. 32, at 17-19). Gudino avers that he cannot be detained based on the alleged violation of his order of supervision both because he is protected from detention because of his TPS and because Respondents detained him without proper notice. (Doc. 39, at 12-15).

Under federal regulations, after ICE issues a noncitizen a final order of removal, ICE "may release [the noncitizen] under an order of supervision under § 241.4 if it determines that the [noncitizen] would not pose a danger to the public or a risk of flight, without regard to the likelihood of the [noncitizen]'s removal in the reasonably foreseeable future." 8 C.F.R. § 241.13. However, the order of supervision may have conditions of release and any noncitizen "released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody." 8 C.F.R. § 241.4 (l)(1); *see also Roe v. Oddo,* No. 3:25-CV-128, 2025 WL 1892445, at *4 (W.D. Pa. July 9, 2025) (stating "[r]evocation of release is governed by Section 241.4(l). Revocation of release can occur for two reasons: (i) the [noncitizen] violates the conditions of release, or (ii) ICE determines in its discretion to revoke release"). Under 8 U.S.C. § 1254a, the statute governing TPS, ICE may not detain a TPS recipient "on the basis of the [recipient]'s immigration status in the United States." 8 U.S.C. § 1254a(d)(4).

Courts must read statutes and regulations "'as a symmetrical and coherent regulatory scheme.'" *Argueta-Orellana v. Att'y Gen. United States*, 35 F.4th 144, 148 (3d Cir. 2022) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). The Court must read 8 U.S.C. § 1254a(d)(4) and 8 C.F.R. § 241.4(l)(1) together and "'fit, if possible, all parts into an harmonious whole.'" *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *F.T.C. v. Mandel Bros.*, Inc., 359 U.S. 385, 389 (1959)). Reading the statute and regulations as a harmonious whole, the Court finds that 8 U.S.C. § 1254a(d)(4) does not prohibit detention pursuant to 8 C.F.R. § 241.4(l)(1). 8 U.S.C. § 1254a(d)(4) relates to detention "on the basis of [a TPS recipient]'s immigration status." 8 C.F.R. § 241.4(l)(1), on the other hand, relates to detention on the basis of violations of an order of supervision, not a noncitizen's immigration status. Thus, the Court finds that TPS status does not prevent ICE from detaining noncitizens based on a violation of an order of supervision.

Gudino argues that even if he could be detained/re-detained on the basis of his alleged violation of his order of supervision, the government violated federal regulations because it failed to give him prompt notice that it was revoking his order of supervision. (Doc. 39, at 13-14). Pursuant to 8 C.F.R. § 241.4(l)(1), "[u]pon revocation" of an order of supervision, a noncitizen "will be notified of the reasons for revocation of his or her release or parole. The [noncitizen] will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l)(1). Under this regulation, the government must afford detainees with prompt notice of the basis of the revocation of their order of supervision and the opportunity to challenge that revocation shortly after the noncitizen is detained. 8

11

C.F.R. § 241.4(l)(1). The government did not inform Gudino of the basis of his detention for nearly a month after his alleged violation of his terms of release. (Doc. 18-14; Doc. 18-15). Thus, the government violated federal regulations after detaining Gudino because it did not provide him with notice that it was revoking his order of supervision "[u]pon revocation." 8 C.F.R. § 241.4(l)(1); *see M.S.L. v. Bostock*, No. 6:25-CV-01204, 2025 WL 2430267, at *10 (D. Or. Aug. 21, 2025) (finding the government failed to provide notice "upon revocation" where it did not give notice until two days after a petitioner was detained); *see also Phan v. Noem*, No. 3:25-CV-02422, 2025 WL 2898977, at *4 (S.D. Cal. Oct. 10, 2025) (finding the government violated its own regulations by failing to provide a detainee with an interview challenging his reasons for revocation for "over a month").

However, while the Court acknowledges that the government violated federal regulations by failing to give Gudino prompt notice of the revocation of his order of supervision, and Gudino's petition is considered granted, the Court already ordered release, the only relief Gudino is entitled to. (Doc. 29). The Court cannot issue an order prohibiting future re-detention on the basis of the government's regulatory violation because government agencies, such as ICE, may cure procedural deficiencies by withdrawing a prior action and then following proper procedure. *See Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 179 (3d Cir. 2000) (finding that although an agencies initial decision violated statutory procedural requirements, the agency cured the defect by "withdrawing the defective application, curing the defect, and then resubmitting the application"); *see also Citizens Advisory Comm. On Priv. Prisons, Inc. v. U.S. Dep't of Just.*, 197 F. Supp. 2d 226, 248 (W.D. Pa. 2001), *aff'd*, 33 F. App'x 36 (3d Cir. 2002) (finding that an agency cured its regulatory violations by restarting a project and following proper procedure). The Court may not issue an order

12

preventing future detention based on speculation that because the government committed regulatory violations in the past, it is likely to commit them again in the future. *See Ssendikwqanawa v. Lowe*, No. 3:14-CV-01241, 2015 WL 5037573, at *4 (M.D. Pa. Aug. 25, 2015) (stating "the argument that [petitioner] risks another detention is 'wholly speculative' and cannot overcome the conclusion that the relief sought by the habeas petition has already been granted"). If the government fails to follow proper procedures when re-detaining Gudino, "it would merely give rise to a[ ]new case or controversy necessitating a[ ]new habeas petition." *Ssendikwqanawa*, 2015 WL 5037573, at *4. Thus, while Gudino's petition is considered **GRANTED**, the Court will not grant Gudino's requests for the Court to preemptive relief. (Doc. 1, at 37).

### 4.      Detention of Gudino Based Upon TPS Withdrawal

The Court previously determined that Gudino was unlikely to succeed on the merits of his argument that the government could not detain Gudino on the basis of DHS withdrawing his TPS. (Doc. 28, at 13-16). Lowe requests the Court find that Gudino's argument fails on the merits because relevant TPS statutes and regulations do not prevent the government from detaining Gudino pending appeal of his TPS withdrawal. (Doc. 32, at 19-21). Gudino avers that TPS statutory and regulatory protections prohibit the government from detaining him based on the withdrawal of his TPS pending his appeal of his TPS withdrawal. (Doc 39, at 15-16).

On April 14, 2025, DHS withdrew Gudino's TPS on the basis that he was never eligible for TPS. (Doc. 22-1). 8 U.S.C. § 1158(b)(2)(A) describes certain noncitizens ineligible for asylum. 8 U.S.C. § 1254a, the statute governing TPS, incorporates 8 U.S.C. § 1158(b)(2)(A), noting that a noncitizen "shall not be eligible for temporary protected status"

if he is a noncitizen that would have also been denied asylum for reasons articulated in 8 U.S.C. § 1158(b)(2)(A). One of those reasons is that "there are reasonable grounds for regarding the [noncitizen] as a danger to the security of the United States." 8 U.S.C. § 1158(b)(2)(A)(v); *see* 8 U.S.C. § 1254a(c)(2)(B)(ii).

Regulations found at 8 C.F.R. § 244.14(b)(3) govern the withdrawal of TPS based upon a determination that an individual was ineligible for TPS in the first place and provide:

> If the basis for the withdrawal of Temporary Protected Status constitutes a ground of deportability or excludability which renders [a noncitizen] ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c), the decision shall include a charging document which sets forth such ground(s) with notice of the right of a de novo determination of eligibility for Temporary Protected Status in deportation or exclusion proceedings.

8 C.F.R. § 244.14(b)(3).

The language "renders [a noncitizen] ineligible for Temporary Protected Status under § 244.4" describes a determination that the noncitizen was never eligible for TPS in the first place because § 244.4 pertains to individuals who are "ineligible for Temporary Protected Status." 8 C.F.R. § 244.4; *see* 8 C.F.R. § 244.14(b)(3); *see also* 8 C.F.R. § 244.4. Here, DHS's basis for withdrawing Gudino's TPS is that he was never eligible for TPS due to his alleged association with TdA. (Doc. 22-1). Thus, Gudino's TPS was withdrawn pursuant to 8 C.F.R. § 244.14(b)(3) and 8 C.F.R. § 244.4. While former TPS recipients whose TPS is withdrawn pursuant to 8 C.F.R. § 244.14(b)(3) and 8 C.F.R. § 244.4 have a "right of a de novo determination of eligibility for [TPS]" under 8 C.F.R. § 244.14(b)(3), the regulations are silent as to what rights or benefits a former TPS holder retains during this de novo process.

According to Gudino, he maintains the benefit not to be detained under 8 C.F.R. § 244.14, which states, "[TPS] benefits will be extended during the pendency of an appeal." (Doc. 39, at 15). Gudino points to 8 C.F.R. § 244.10(f) which outlines the benefits of TPS for

14

the proposition that he may not be detained pending appeal. (Doc. 39, at 15-16). However, non-detention is not a listed benefit of TPS under 8 C.F.R. § 244.10(f). Instead, the regulation lists benefits related to non-removal, employment, travel, and lawful status. The TPS statute, 8 U.S.C. § 1254a, also does not list non-detention outside of non-detention on the basis of immigration status as a benefit of TPS. Accordingly, Gudino's argument that he maintains a general benefit of non-detention pending his appeal of DHS withdrawing his TPS fails.

Gudino also argues that he may not be detained under the TPS statute because his removal is not "reasonably foreseeable." (Doc. 39, at 16). Gudino relies on the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001). (Doc. 39, at 16). In *Zadvydas*, the Supreme Court held that under the doctrine of constitutional avoidance, courts should not read immigration statutes to allow indefinite detention of noncitizens. 533 U.S. at 697. However, the Court does not read the TPS statute to allow *indefinite* detention. Under the TPS statute, if Gudino's appeal of DHS's withdrawal of his TPS is denied, he could not be removed because he will have TPS. 8 U.S.C.A. § 1254a (a)(1)(A). However, while Gudino may not be removed pending his appeal under 8 C.F.R. § 244.14, if his appeal fails, he may be subject to removal due to his final order of removal and his alleged violations of his order of supervision. (Doc. 18-10; Doc. 18-13; Doc. 18-14). Thus, the Court's reading of the TPS statute is consistent with *Zadvydas* because the Court does not read the statute to allow indefinite detention and Gudino's removal is reasonably foreseeable because he is subject to removal if his appeal fails. 533 U.S. at 699; *see* (Doc. 18-10; Doc. 18-13; Doc. 18-14); *see Contant v. Holder*, 352 Fed. Appx. 692, 694-95 (3d Cir. 2009) (nonprecedential) (noting that "'post-removal period detention, unlike detention pending a determination of removability. . . has no obvious termination point'" and that there is "no indication that [petitioners] cannot

15

be deported . . . following an unfavorable removability decision" (citing Zadvydas, 533 U.S. at 697)). Accordingly, the Court **DENIES** Gudino's habeas petition to the extent he avers he may not be detained based on DHS withdrawing his TPS status. (Doc. 1).

        B.        DUE PROCESS PROTECTIONS

Gudino avers the government violated his substantive and procedural due process rights under the Fifth Amendment. (Doc. 1, ¶¶ 103-15). Gudino requests this Court find that his prior detention violated his Fifth Amendment rights and that the Court prohibit Respondents from re-detaining him. (Doc. 1, at 37; Doc. 39, at 21). The Court will first address Gudino's substantive due process rights and then turn to his procedural due process rights.

        1.        **Gudino's Substantive Due Process Claim**

The Court previously determined that Gudino was not likely to succeed on the merits of his substantive due process claims. (Doc. 28, at 16-19). Lowe urges the Court to find Gudino's substantive due process claim fails on the merits because detention is a constitutionally valid part of Gudino's deportation proceedings. (Doc. 32, at 22-24). Gudino only addresses procedural due process in his traverse and does not address the Court's finding on substantive due process. (Doc. 39, at 17-21).

The Fifth Amendment entitles noncitizens to due process during deportation proceedings. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *see also Lopez v. Sessions*, No. 18 CIV. 4189 (RWS), 2018 WL 2932726, at *10 (S.D.N.Y. June 12, 2018). However, detention during removal proceedings does not by itself "violate the protections guaranteed under the Constitution." *Hernandez v. Sabol*, 823 F. Supp. 2d 266, 271 (M.D. Pa. 2011). To succeed on a substantive due process claim, a petitioner

must demonstrate that his detention served no legitimate government purpose and was "a misuse of governmental power that shocks the conscience." *Desousa v. Garland*, No. CV 21-3961, 2022 WL 1773604, at *3 (E.D. Pa. May 31, 2022) (citing *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994)); *see also Hernandez*, 823 F. Supp. 2d at 272 (finding that while general detention during removal proceedings is constitutional, detaining a noncitizen for three years without removing him was unconstitutional). In the immigration context, "the Court must determine whether [a petitioner's] detention is rationally connected to a legitimate government purpose and whether [the detention] is excessive in relation to that purpose." *Malam v. Adducci*, 469 F. Supp. 3d 767, 790 (E.D. Mich. 2020); *see Hernandez*, 823 F. Supp. 2d at 272 (finding the reasonableness of a noncitizen's detention is determined by evaluating its relationship to an immigration statute's purpose of conducting efficient removal proceedings).

Here, the immigration regulatory scheme explicitly authorizes detention based upon a violation of an order of supervision. *See* 8 C.F.R. § 241.4(l)(1) ("[a]ny [noncitizen]. . . who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody"). The government has a legitimate government interest in enforcing conditions of release which ensure a released detainee does not flee and protect the public. *See Malam*, 469 F. Supp. 3d at 790; *see also Rafael L.O. v. Tsoukaris*, No. CV 20-3481, 2020 WL 1808843, at *9 (D.N.J. Apr. 9, 2020) (stating "ICE undoubtedly has a legitimate interest in ensuring that the petitioners do not flee and in protecting the public"). In this case, Gudino is subject to a final order of removal and conditions of release which he allegedly violated. (Doc. 18-10; Doc. 18-13; Doc. 18-14). Accordingly, the government has a legitimate interest in enforcing Gudino's conditions of release.

While Gudino does not discuss his substantive due process rights in his traverse, he does cite to the Supreme Court's decision in *Zadvydas*. (Doc. 39, at 16). In *Zadvydas*, the Supreme Court held that indefinite civil detention violates the detainees' substantive due process rights. 533 U.S. at 690. The Court further held that immigration officials may only detain a non-citizen so long as their removal is "reasonably foreseeable." 533 U.S. at 690. However, as discussed *supra* Section III.A.4, Gudino's potential detention is not indefinite because the Court does not read the relevant statutory and regulatory framework to allow Gudino's continued detention if his appeal of DHS's withdrawal of his TPS succeeds. Further, the length of detention is generally not unreasonable until the noncitizen has been detained for more than six months. *See Zadvydas*, 533 U.S. at 701 (holding that executive agencies may not hold noncitizens longer than six-months when removal is not foreseeable and stating "[a]fter this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing"); *see also Alvarez v. U.S. Dep't of Homeland Sec.*, No. CIV.A. 06-3320, 2006 WL 2385119, at *5 (D.N.J. Aug. 17, 2006) (denying habeas relief based upon substantive due process violations when a petitioner had not been detained for six months and stating "[o]nly if DHS continues to detain Petitioner beyond the six-month period determined to be presumptively reasonable[. . . ] in *Zadvydas*, will Petitioner's habeas claim mature."); *see also Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002) (stating "to state a claim under *Zadvydas* the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future"). The Court ordered Gudino's release before he was in custody for six months. (Doc. 29).

18

Accordingly, the Court **DENIES** Gudino's habeas petition to the extent he avers his detention and potential re-detention violate his substantive due process rights. (Doc. 1).

### 2.    Gudino's Procedural Due Process Claim

The Court previously found that Gudino was likely to succeed on the merits of his procedural due process claim because the government failed to provide Gudino with notice of the basis of his detention until nearly a month after he was detained. (Doc. 28, at 19-24). Lowe avers that the Court overstated the risk of erroneous deprivation of Gudino's liberty interests in its analysis and thus incorrectly found Gudino was likely to succeed on his procedural due process claim. (Doc. 32, at 24-28). Lowe also argues that even if the government did violate Gudino's procedural due process rights, it remedied that violation when the government provided Gudino notice after he was detained. (Doc. 32, at 29). Gudino urges the Court to find that the government violated his due process rights by failing to provide him with notice of the basis of his detention prior to detaining him. (Doc. 39, at 17-21). Gudino also requests that the Court prohibit the government from re-detaining him. (Doc. 1, at 37; Doc. 39, at 21).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. . . The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)); *see Gayle v. Johnson*, 81 F. Supp. 3d 371, 382 (D.N.J. 2015), *vacated and remanded sub nom. Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297 (3d Cir. 2016) (abrogated on other grounds). Procedural due process rights extend to noncitizens facing civil detention. *See Zadvydas*, 533 U.S. at 690; *see also Dia v. Ashcroft*, 353

19

F.3d 228, 239 (3d Cir.2003); *see also Gayle*, 81 F. Supp. 3d at 382. Non-citizen "detainees have a right to notice and an opportunity to be heard 'appropriate to the nature of the case.'" *J. G. G.*, 604 U.S. at 673 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "[E]ven in circumstances where mandatory detention is constitutionally permissible, due process still requires 'adequate procedural protections.'" *Gayle*, 81 F. Supp. 3d at 382 (quoting *Zadvydas*, 533 U.S. at 690).

Courts evaluate whether a civil detainee has received adequate due process by evaluating the factors articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529-533 (2004) (applying the *Mathews* factors to find that "citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker"); *see also Black v. Decker*, 103 F.4th 133, 147 (2d Cir. 2024) (stating "[m]any courts have applied the *Mathews* factors. . . to determine what process is due to noncitizens in removal proceedings"); *see also Martinez*, 385 F. Supp. 3d at 364 (applying the *Mathews* test to determine that an individual detained by ICE received constitutionally inadequate procedural due process). In *Mathews*, the Supreme Court articulated the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> *Mathews*, 424 U.S. at 335.

Courts weigh these three factors to determine whether a civil detainee received adequate due process. *See Hamdi*, 542 U.S. at 529-533; *see also Black*, 103 F.4th at 147; *Martinez*, 385 F. Supp.

3d at 364. The Court previously weighed each factor and determined that Gudino was likely to succeed on his claim that Respondents violated his procedural due process rights. (Doc. 28, at 19-24). Reexamining these factors, the Court finds that the government violated Gudino's procedural due process rights by failing to give him notice of the basis of his detention until after he was already detained. The Court will address each factor in turn.

The first *Mathews* factor is "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 335. As the Court previously determined, freedom from detention is the highest personal liberty interest a person can have. (Doc. 28, at 21); *see Martinez*, 385 F. Supp. 3d at 364 (finding that an immigrant detained by ICE had "the highest [private] interest one can have"); *see also Hamdi*, 542 U.S. at 529 (stating freedom from physical detention "is the most elemental of liberty interests"); *see also Zadvydas*, 533 U.S. at 690 (finding that freedom from government custody lies at the heart of due process protections). Thus, this factor weighs in favor of providing Gudino with additional procedural due process.

The second *Mathews* factor is "the risk of an erroneous deprivation of such interest through the procedures used." 424 U.S. at 335. The Court previously determined that Gudino was likely to succeed on the merits of his procedural due process claim because the government failed to provide him with notice of the basis for his detention until after he was already detained for nearly a month. (Doc. 28, at 22). The Court noted that risk of erroneous deprivation is high where a petitioner "must challenge their deprivation 'within prison, where his access to his belongings, the courts, and to counsel is severely limited.'" (Doc. 28, at 22); (quoting *Martinez*, 385 F. Supp. 3d at 364).

21

While making this determination, the Court cited to the Southern District of New York's decision in *Martinez v. MacAleenan*, 385 F. Supp. 3d 349 (S.D.N.Y. 2019). (Doc. 28, at 22). Lowe avers that *Martinez* is distinguishable because the petitioner in *Martinez* was in custody for four months before the government provided him with a basis for his detention, whereas here, Gudino was only in custody for twenty-six days before receiving notice. (Doc. 32, at 26). Relatedly, Lowe contends that *Martinez* is distinguishable because the *Martinez* petitioner filed his habeas petition two months after the government detained him, whereas here, Gudino filed his habeas petition only seventeen days after he was detained. (Doc. 32, at 27-28). The Court finds both arguments unpersuasive. The *Martinez* court emphasized that when a detainee is not given "advanced written notice" of the basis for their detention, the risk of erroneous deprivation is "extremely high" because it is far more difficult to challenge an erroneous detention from within a detention facility than outside of a detention facility where the detainee has easy access to their "belongings, the courts, and to counsel." 385 F. Supp. 3d at 364. Thus, it is inconsequential that the *Martinez* petitioner spent four months in detention prior to receiving notice of the basis for their deprivation, whereas Gudino only spent twenty-six days in detention. The Court also disagrees with Lowe's contention that Gudino's case is distinguishable from *Martinez* because Lowe filed his habeas petition within seventeen days as opposed to four months. (Doc. 32, at 27-28). Gudino filing his habeas petition more promptly than the *Martinez* petitioner does not change the fact that Gudino had to challenge his detention in while detained and this increased the risk of erroneous deprivation. *See Martinez*, 385 F. Supp. 3d at 364.

Lowe further avers this case is distinguishable from *Martinez* because "[m]embers of an FBI Task Force took Gudino into custody during the execution of a search warrant related

to an investigation of TdA and notified ICE." (Doc. 32, at 27). According to Lowe, the Court cannot apply *Martinez*'s analysis of the risk of erroneous deprivation because Gudino's detention arose out of an FBI search related to suspected TdA activity. (Doc. 32, at 27). However, the question under the second *Mathews* factor is not whether the government had good reason to suspect civil detention was warranted, but rather, whether it provided sufficient procedural due process to reduce the risk of erroneous deprivation. 424 U.S. at 335; *see Martinez*, 385 F. Supp. 3d at 364. Regardless of when the government first suspected Gudino's alleged TdA affiliation, it did not provide Gudino of written notice of its determination that he was affiliated with TdA until April 9, 2025, nearly a month after detaining him. (Doc. 18-15). Further, to the extent Lowe implies that Gudino was taken into custody by the FBI based on its investigation into TdA, Lowe's evidence does not support such a contention. The relevant FBI search warrant does not mention TdA or Gudino. (Doc. 18-12). Further, Lowe's contemporaneous ICE records state that the FBI contacted ICE after encountering Gudino because he "appeared to be foreign born" and the FBI wanted to "verify citizenship." (Doc. 18-13, at 2). Lowe's ICE records also indicate that the FBI did not arrest Gudino, but rather the FBI "[t]urned [Gudino] over to [ICE] officers and [Gudino] was arrested without incident pursuant to a Warrant for Arrest of Alien." (Doc. 18-13, at 2). Nothing in the record indicates the FBI detained Gudino because FBI agents believed him to be a member of TdA or suspected he was involved in TdA activity. The record supports the Court's original conclusion that the government created a high risk of erroneous deprivation by detaining Gudino and not providing notice of the basis for his detention until after he was detained for nearly a month. (Doc. 28, at 22); *see Martinez*, 385 F. Supp. 3d at 364.

The final *Mathews* factor is "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The government faced a low burden in providing advanced notice of the basis of Gudino's detention because the relevant regulations required it to give Gudino notice of "the reasons for revocation of his release or parole" "[u]pon revocation." 8 C.F.R. § 241.4(l)(1); *see Marshall v. Lansing*, 839 F.2d 933, 943 (3d Cir. 1988) (stating "principles of due process require an agency to follow its own regulations"). The government is also not heavily burdened by requirements that they provide civil detainees with "a meaningful opportunity for [them] to search [their] papers, solicit counsel, and contest detention." *Martinez*, 385 F. Supp. 3d at 364.

Lowe avers that "the immigration regulations do not set any specific timeline for the notice requirement with respect to a noncitizen's revocation of an order of supervision." (Doc. 32, at 26). However, the regulations require notice "[u]pon revocation." 8 C.F.R. § 241.4(i)(1). The govenrment giving Gudino notice twenty-six days after revocation is not notice "upon revocation." *See M.S.L.*, 2025 WL 2430267, at *10 (finding the government providing notice two days after detention did not constitute notice "upon revocation"). Further, Lowe presents evidence that that ICE believed Gudino was associated with TdA the day Gudino was detained, so it would not have been difficult for the government to inform Gudino ICE's belief prior to detaining him. (Doc. 18-13, at 2). There is no administrative burden associated with providing a detainee and their counsel with notice of the basis of detention as required by DHS regulations. *See Martinez*, 385 F. Supp. 3d at 364 (stating "[t]he Government had little to lose by providing Petitioner with advanced written notice on completed forms and offering a meaningful opportunity for him to search his papers, solicit

counsel, and contest detention"); *see also Marshall*, 839 F.2d at 943 (stating "principles of due process require an agency to follow its own regulations"). Therefore, the final *Mathews* factor does not weigh against requiring the government to provide reasonable advanced notice to civil detainees of the basis of their detention. (Doc. 28, at 23); *see Martinez*, 385 F. Supp. 3d at 364.

Based on the above, the Court finds that the government violated Gudino's procedural due process rights by detaining him without providing him advanced written notice of the basis of his detention. The Court previously ordered Gudino's release from custody, and Gudino is no longer detained. (Doc. 29). Gudino now avers that the government has "already violated Mr. Arias Gudino's due process rights by failing to provide notice of his TPS withdrawal and OSUP revocation prior to his unlawful detention. [The government] should be barred from re-detaining him on precisely the same grounds." (Doc. 39, at 17) (citations omitted). However, the Court cannot proactively bar future detention based on the government's prior procedural due process violations. Where the government violates a petitioner's procedural due process rights, it may "cure a procedural deprivation by providing a later procedural remedy." *Bonilla v. City of Allentown*, 359 F. Supp. 3d 281, 297 (E.D. Pa. 2019), *as amended* (Apr. 19, 2019) (dismissing a Section 1983 procedural due process claim where a municipality initially violated the plaintiff's due process rights but later reversed their adverse actions against the plaintiff and provided adequate procedural remedies); *see also Batanic v. I.N.S.*, 12 F.3d 662, 667 (7th Cir. 1993) (stating "[g]enerally speaking, procedural errors are cured by holding a new hearing in compliance with due process requirements"). Further, the Court may not proactively assume the government will violate procedural due process again based on its previous actions. *See Ssendikwqanawa*, 2015 WL 5037573, at *4. If

25

the government re-detains Gudino, it must respect his procedural due process rights by providing him "with advanced written notice on completed form and [offer him] a meaningful opportunity for him to search his papers, solicit counsel, and contest detention." *Martinez*, 385 F. Supp. 3d at 364. If the government fails to do so, Gudino may file a new habeas petition. *See Ssendikwqanawa,* 2015 WL 5037573, at \*4. Thus, Gudino's habeas petition is considered **GRANTED**. (Doc. 1, at 37).

## IV. CONCLUSION

Pursuant to the foregoing, Gudino's habeas petition (Doc. 1) is **GRANTED**. The Clerk of Court is directed to close this case. An appropriate Order follows.

**Dated: February 25, 2026**                    *s/ Karoline Mehalchick*

                                        **KAROLINE MEHALCHICK**
                                        **United States District Judge**

26